<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PATRICK PANTUSCO<br><br>                              Plaintiff,<br><br>v.<br><br>ROBERT SORRELL, ET AL.,<br><br>                              Defendants. | Civ. No. 09-3518 (DRD)<br><br><u>**O P I N I O N**</u> |

*Appearances by:*

Patrick Pantusco
#298211-908974B
Northern State Prison
P.O. BOX 2300
Newark, New Jersey 07114

   *Pro Se Plaintiff*

ATTORNEY GENERAL OF NEW JERSEY
by: Paula T. Dow, Esq.
    Jennifer Hsia
R.J. Hughes Justice Complex
P.O. BOX 112
Trenton, New Jersey 08625

   *Attorneys for Defendants.*

<u>**DEBEVOISE, Senior District Judge**</u>

This matter arises out of the alleged sexual assault of an inmate at East Jersey State Prison in Rahway, New Jersey. Plaintiff Patrick Pantusco alleges that, on June 29, 2009, at

approximately 6:45am, Senior Corrections Officer Robert Sorrell groped his genitals during a routine pat frisk.  On July 16, 2009, Mr. Pantusco filed a Civil Rights Complaint against Sco. Sorrell, Sergeant Mountcastle-Thomas, and Senior Corrections Officer Swann alleging that he was sexually assaulted in violation of 42 U.S.C. § 1983 ("Section 1983").  On August 3, 2009, Mr. Pantusco filed an Amended Complaint adding Sergeant Dircks, Lieutenant Popowich and Donald Mee as defendants and claiming that the sexual assault constituted cruel and unusual punishment under the Eighth Amendment of the United States Constitution and violated the equal protection clause of the Fourteenth Amendment.  Mr. Pantusco also claims that Defendants retaliated against him for reporting the sexual assault by filing false reports regarding the assault and threatening further assault.

Defendants now move for Summary Judgment against all of Mr. Pantusco's claims.  For the reasons set forth below, Defendants' motion is granted.  Mr. Pantusco's equal protection claim fails because he does not allege that he was treated differently than other inmates or the subject of discrimination.  His Eighth Amendment claim fails because a single instance of groping does not amount to cruel and unusual punishment.  Finally, while the record indicates that certain defendants did, in fact, file false reports in connection with an investigation into the alleged sexual assault, Mr. Pantusco's retaliation claim fails because there is no evidence of adverse taken against him, and mere threats of such action are insufficient to state such a claim.

## I.  BACKGROUND

**A.     The Pat-Frisk**

The Amended Complaint states that, on June 29, 2009, at approximately 6:45am, while Mr. Pantusco was reporting to his work assignment in the mess hall of East Jersey State Prison, Sco. Sorrell stopped him in the Tie-Too—the prison's main corridor—to conduct a routine pat

frisk. Mr. Pantusco alleges that during the pat frisk, Sco. Sorrell grabbed and squeezed his penis through his pant leg, leaned into his back and said, "Now you can go." (Amend. Compl. ¶ 10.)

Mr. Pantusco further alleges that he immediately reported the incident to Sgt. Mountcastle-Thomas, who replied that he should "write it up." (Id. ¶ 11.) As Mr. Pantusco continued on his way to the mess hall, Sco. Swann called him back into the Tie-Too and allegedly yelled at him for reporting the incident to Sgt. Mountcastle-Thomas.

The video evidence submitted by Defendants largely confirms Mr. Pantusco's account. In footage taken by the Tie-Too West Camera, on June 29, 2009, at approximately 6:32am, Mr. Pantusco is seen walking through the metal detector in the Tie-Too and immediately up to an officer, presumably Sgt. Mountcastle-Thomas. Another officer joins them, presumably Sco. Swann. On the same date and time, the Tie-Too East Camera shows Mr. Pantusco being pat frisked, presumably by Sco. Sorrell. It is difficult to discern the exact nature of the frisk because it occurs nearly out of view of the East Camera (and completely out of view of the West Camera). Sco. Sorrell appears to touch Mr. Pantusco's groin area; although the nature of the touch remains unclear.

As with the West Camera, the East Camera shows Mr. Pantusco walk through the metal detector and up to Sgt. Mountcastle-Thomas. When speaking to her, he excitedly points toward the opposite end of the Tie Too where he was frisked demonstratively grabbing at his groin area. At that point, Sco. Swann joins the discussion and Mr. Pantusco grabs at his groin a second time. After a few more seconds, Mr. Pantusco leaves the Tie Too area, presumably to report to his work detail in the mess hall.

**B.     The Strip Search**

Approximately an hour and a half later, according to the Amended Complaint, Mr. Pantusco completed his work assignment in the mess hall and began making his way back to his cell. As Mr. Pantusco was walking back through the Tie-Too, Sco. Sorrell allegedly stopped him and ordered that he dump the cup of coffee and orange juice that he was carrying. Mr. Pantusco alleges that as he was dumping the coffee and juice, Sco. Sorrell "walked to the far wall of the Tie-Too[,] out of view of the Tie-Too security camera[,] and said, "'I'm really gonna frisk you now.'" (Id. ¶ 15.) At that point, Mr. Pantusco claims that he was afraid that Sco. Sorrell was going to sexually assault him again, and, as a result, "began to walk toward the Tie-Too" doorway, making sure to stay in the center of the Tie-Too and in view of the security cameras. (Id. ¶ 16.) Sco. Sorrell then pointed at Mr. Pantusco and ordered him to stop for a pat frisk, but, fearing further sexual assault, Mr. Pantusco continued to walk toward the doorway.

As he reached the doorway, he saw Sergeant Cvasa standing approximately ten yards away and attempted to tell him that Sco. Sorrell was harassing him. In response, Sgt. Cvasa ordered three officers to "Strip Him." (Id. ¶ 18.) Mr. Pantusco alleges that he was then escorted by three officers to the Tie-Too conference room and given a full strip search.

The video evidence also confirms this account. At approximately 8:10am, the West Camera shows Mr. Pantusco walking through the metal detector in the Tie Too. As he clears the metal detector, an officer, presumably Sco. Sorrell, speaks with Mr. Pantusco. Mr. Pantusco goes back around the metal detector and pours liquid out of a cup into a garbage can. Sco. Sorrell then walks out of view of the West Camera while Mr. Pantusco walks back through the metal detector and similarly out of view.

A few seconds later, the West Camera shows several officers look in the direction where Mr. Pantusco and Sco. Sorrell had just gone. Several seconds after that, Mr. Pantusco is escorted

4

by an officer to the Tie-Too conference room. Two officers follow and the door is shut. A fourth officer enters the conference room approximately one minute later.

The East Camera also shows Mr. Pantusco walk through the metal detector in the Tie-Too, receive instructions from Sco. Sorrell, and go back to dump liquid into a garbage can. After Mr. Pantusco walks back through the metal detector to leave the Tie-Too, Sco. Sorrell motions to Mr. Pantusco, who ignores him and keeps walking. Sco. Sorrell and several other officers follow Mr. Pantusco and escort him back to the Tie Too conference room.

**C.     The Disciplinary Charges**

During Mr. Pantusco's strip search, Sco. Sorrell left the Tie Too area to file a disciplinary report against Mr. Pantusco for refusing to submit to a search. He filed the report that same day. (Certification of Jennifer S. Hsia, dated February 3, 2011 ("Hsia Cert."), Ex. A.)

According to Mr. Pantusco, at some point during the strip search, Sgt. Dircks entered the Tie-Too conference room and asked why he had refused to be frisked by Sco. Sorrell. Mr. Pantusco claims he told Sgt. Dircks about the sexual assault, who responded that he should write a formal complaint after returning his housing wing. Upon returning to his wing, Mr. Pantusco alleges that he told Sco. Rivera that he had been sexually assaulted by Sco. Sorrell and that Sco. Rivera provided him with complaint forms to fill out. As he began filling out the forms, Sgt. Dircks, Sco. Granato, and Sco. Ramsey escorted Mr. Pantusco to the prison's medical department, where he was examined for injuries. None were found.

Mr. Pantusco was then escorted to and remained in the Pre-Hearing Detention area pending the disposition of Sco. Sorrell's disciplinary charge against him. While in Pre-Hearing Detention, Mr. Pantusco told Sco. Baily that he was sexually assaulted by Sco. Sorrell. Sco. Baily claims that he reported Mr. Pantusco's allegations to his supervisor. (Hsia Cert., Ex. A.)

A disciplinary hearing was held at which Mr. Pantusco was shown a video of himself refusing Sco. Sorrell's orders. Mr. Pantusco did not dispute that he had refused those orders, but maintained that he did so because had been sexually assaulted by Sco. Sorrell and was afraid of further assault or harassment. He further maintained that he attempted to report the incident to "every supervisor he came into contact with." (Amend. Compl. ¶ 37.)

The Disciplinary Hearing Officer upheld the charge[1] against Mr. Pantusco because he admitted that he refused to submit to a pat frisk by Sco. Sorrell. (Hsia Cert., Ex. B.) As a result, Mr. Pantusco received 10 days detention, 90 days administrative segregation, 60 days loss of commutation time, and 35 days loss of recreational privileges. (Id.) The New Jersey Superior Court, Appellate Division affirmed the Disciplinary Hearing Officer's decision on June 21, 2010. (Hsia Cert., Ex. C.)

D.   **The Administrative Investigation**

On June 29, 2009, The Special Investigations Division of the New Jersey Department of Corrections, initiated an Administrative Investigation, led by Senior Investigator Christopher Birardi, into Mr. Pantusco's allegations of sexual assault. Mr. Birardi's investigation largely consisted of interviews with corrections officers that came into contact with Mr. Pantusco on the day of the alleged assault.

Sco. Sorrell told Mr. Birardi that he pat frisked Mr. Pantusco in the Tie-Too while he was on his way to the prison mess hall, but denied touching his penis or pat frisking him in an otherwise unprofessional manner. See (Declaration of Christopher Birardi, dated February 3, 2011 ("Birardi Decl."), Ex. A.) In addition, Officer Nicolas, who allegedly witnessed Sco. Sorrell's pat frisk, told Mr. Birardi that he saw nothing unprofessional about it. See (id.)

---

[1] The Disciplinary Hearing Officer, in fact, found Mr. Pantusco liable for refusing to obey an order, instead of refusing to submit to a search.

Sco. Sorrell also told Mr. Birardi about the events leading up to Mr. Pantusco's strip search. He stated that, at approximately 8:10am, as Mr. Pantusco was returning through the Tie-Too from the mess hall, he "ordered [Mr. Pantusco] to throw his excess juice in the garbage, and then . . . motioned to come to him for a pat frisk." (Id.) Sco. Sorrell stated that he was "ignored by [Mr. Pantusco] and that the Star Sergeant ordered that [Mr. Pantusco] be strip searched as a result of his refusal to be frisked." (Id.)

Sgt. Dircks confirmed that Mr. Pantusco refused Sco. Sorrell's orders, and, as a result, was taken to the Tie-Too conference room to be strip searched. During the strip search, Sgt. Dircks asked Mr. Pantusco why he refused to submit to Sco. Sorrell's pat frisk, to which Mr. Pantusco allegedly replied, "I did not want him pat frisking me. I went through the machine, he has no right to search me." (Id.) Sgt. Dircks maintains that Mr. Pantusco made no allegations of sexual assault or harassment at that time.

One very troubling aspect of Mr. Birardi's investigation was his acceptance of false statements by certain corrections officers regarding when they became aware of the alleged sexual assault. For example, while the aforementioned video evidence clearly indicates that Mr. Pantusco immediately reported the alleged sexual assault to Sgt. Mountcastle-Thomas, she told Mr. Birardi that Mr. Pantusco approached her in the Tie-Too and simply stated, "Officer Sorrell pat frisked me harshly." (Id.) She further claimed that she was not made aware of any allegations of sexual assault or harassment until her interview with Mr. Birardi. (Id.)

Similarly, despite video evidence to the contrary, Sco. Swann told Mr. Birardi that Mr. Pantusco never mentioned that he had been sexually assaulted. He told Mr. Birardi that Mr. Pantusco approached him in the Tie-Too "to speak about an issue he had with Sco. Sorrell," and

7

that because he "did not see any issue between [Mr. Pantusco] and [Sco. Sorrell], [he] referred [Mr. Pantusco] to Sgt. Mountcastle-Thomas." (Id.)

Sgt. Dircks, Sco. Granato, and Sco. Ramsey also stated that at no time did Mr. Pantusco inform them that he had been sexually assaulted or otherwise harmed by an officer. There is no video evidence to confirm or contradict their statements.

Mr. Birardi concluded, based in part on the false statements made by Sgt. Mountcastle-Thomas and Sco. Swann, that Mr. Pantusco's allegation of sexual assault were "extremely doubtful" and that his "motivations [were] suspect" because he made those allegations in a "calm and matter of fact" manner only after receiving Sco. Sorrell's disciplinary charge and being placed in Pre-Hearing Detention. (Birardi Decl., Ex. A.)

## II.  DISCUSSION

Defendants now move for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 against all of Mr. Pantusco's claims. In doing so, they argue that Mr. Pantusco's claims against them in their official capacities are barred by the Eleventh Amendment, and that he has failed to allege facts that support his Eighth Amendment, Fourteenth Amendment, and retaliation claims.[2]

**A.     Standard of Review**

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For

---

[2] Defendants further argue that (1) Sco. Sorrell is entitled to qualified immunity and (2) Section 1983 liability cannot extend to other corrections officers on a theory of respondeat superior. The Court need not reach the merits of these arguments because, as discussed fully below, Mr. Pantusco has failed to state an Eighth or Fourteenth Amendment violation or a claim for retaliation.

a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id.  Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary. Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  "Where the plaintiff is a *pro se* litigant, the court has an obligation to construe the complaint liberally."  Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009).  However, *pro se* litigants must nonetheless set forth facts sufficient to survive summary judgment. Jacobs v. Cumberland County Dep't of Corrections, No. 09-0133, 2010 WL 5141717, at *3 (D.N.J. Dec. 8, 2010) (citing Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.[3]  See Pa. Coal

---

[3] Citing to Scott v. Harris, 550 U.S. 372, 380 (2007), Defendants argue that this Court should not view the facts of this case in the light most favorable to Mr. Pantusco because the videotape evidence in the record "blatantly contradict[s] [Mr. Pantusco's] version of the facts." (Def.'s Br. Summ. J. 8.)  This argument is dumbfounding considering that the video evidence confirms Mr. Pantusco's allegations while blatantly contradicting those made by Sgt. Mountcastle-Thomas and Sco. Swann.  The Court will consider all facts and reasonable inferences in the light most favorable to Mr. Pantusco.

9

Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.  Id. at 251-52.

**B.     Mr. Pantusco's Claims Against Defendants in their Official Capacities**

Defendants correctly point out that Mr. Pantusco's claims against them in their official capacities are barred by the Eleventh Amendment of the United States Constitution.  The Eleventh Amendment states that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any Foreign State."  U.S. CONST. Amend. XI.  In practice, the Eleventh Amendment bars all lawsuits in federal court against states and their agencies and departments.  Penhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 100 (1984).  Absent consent by a state, the Eleventh Amendment also bars actions in federal court against state officers in their official capacities for money damages.  See Kentucky v. Graham, 473 U.S. 159, 169 (1985).  Section 1983 in no way abrogates states' Eleventh Amendment immunity.[4]  Quern v. Jordan, 440 U.S. 332 (1979).

In this case, Defendants are officers of the New Jersey Department of Corrections.  As such, they are state officers.  Because Mr. Pantusco seeks money damages from Defendants in their official capacities, see (Amend. Compl. ¶ 43(c)), and Defendants have not consented to being sued, his claims against them in their official capacities are dismissed.

**C.     Mr. Pantusco's Section 1983 Claims against Defendants in their Individual Capacities**

---

[4] Furthermore, state officers sued in their official capacities are not considered "persons" within the meaning of Section 1983 and therefore are unable to be sued as such under the statute. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 64, 70-71 (1989).

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983

Section 1983 does not create substantive rights; rather "it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." Kneip v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  In order to establish a prima facie case, a plaintiff must show that (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of his rights, privileges, or immunities secured by the Constitution or laws of the United States.  Powell v. Ridge, 189 F.3d 387, 400 (3d Cir.1999).

Mr. Pantusco asserts claims under Section 1983 against Defendants for violations of his rights under the Equal Protection Clause of the Fourteenth Amendment, inflicting cruel and unusual punishment in violation of the Eighth Amendment, and retaliating against him for filing a grievance.  Each will be addressed in turn.

    i.    ***Equal Protection***

Defendants correctly argue that Mr. Pantusco's equal protection claim should be dismissed because he "does not allege facts to support such a claim."  (Def.'s Br. Summ. J. 9.) The Fourteenth Amendment's Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, Section 1.  "To prevail on an equal protection claim, a plaintiff must present evidence that s/he

11

has been treated differently from persons who are similarly situated." Renchenski v. Williams, 622 F.3d 315, 337 (3d Cir. 2010) (quotations and citations omitted). "If state action does not burden a fundamental constitutional right or target a suspect class, the challenged classification must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Id. On the other hand, "[i]f the challenged state action involves a suspect classification based on race, alienage or national origin, or infringes on a fundamental constitutional right, [courts] must apply the strict scrutiny standard." Id.

A plaintiff may also assert a "class of one" theory of discrimination as a violation of the Equal Protection Clause. See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). Under that theory, he must show that "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006).

Mr. Pantusco's equal protection claim fails because he does not allege that he was treated or classified differently than other inmates. Nor do his allegations of sexual assault otherwise suggest discrimination. See Olech, 528 U.S. at 564 ("The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." (quotations and citations omitted)). As a result, Mr. Pantusco's equal protection claim is dismissed.

    *ii.*    ***Cruel and Unusual Punishment***

Defendants also correctly argue that the conduct alleged by Mr. Pantusco does not amount to cruel and unusual punishment under the Eighth Amendment. The Eighth Amendment draws constitutional boundaries on the conditions of imprisonment. "Not every governmental

action affecting the interests or well-being of a prisoner" rises to a constitutional level.  Whitley v. Albers, 475 U.S. 312, 319 (1986).  "[O]nly the unnecessary and wanton infliction of pain" is subject to Eighth Amendment scrutiny.  Id.

To show an Eighth Amendment violation by a prison official, a plaintiff must meet two requirements.  First, the plaintiff must show that the official's conduct is "objectively, sufficiently serious."  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Such conduct must violate contemporary standards of decency.  Hudson v. McMillan, 503 U.S. 1, 8 (1991) (citing Rhodes v. Chapman, 452 U.S. 337, 346 (1981)).  Second, the plaintiff must show that the official had "sufficiently culpable state of mind."  Farmer, 511 U.S. at 834.

Several circuits have found that sexual abuse by corrections officers may violate contemporary standards of decency and therefore meet the first requirement of an Eighth Amendment violation.  See, e.g., Boxer X v. Harris, 437 F.3d 1107, 1111 (11th Cir. 2006); Jackson v. Madery, 158 Fed. App'x. 656, 662 (6th Cir. 2005); Barney v. Pulsipher, 143 F.3d 1299, 1310 (10th Cir. 1998); Boddie v. Schneider, 105 F.3d 857, 862 (2d Cir. 1997).  However, such abuse must be "severe or repetitive."  Boddie, 105 F.3d at 862.  Isolated incidents of verbal harassment or touching do not constitute an Eighth Amendment violation.  See Boxer X, 437 F.3d at 1111 ("a female prison guard's solicitation of a male prisoner's manual masturbation, even under threat of reprisal, does not present more than *de minimis* unjury"); Jackson, 158 Fed. App'x. at 661-62 (rubbing and grabbing prisoner's buttocks by corrections officer held to be "isolated, brief, and not severe"); Berryhill v. Schiro, 137 F.3d 1073, 1076 (8th Cir. 1998) (brief touch to prisoner's buttocks by civilian prison official not a sexual assault under the Eighth Amendment); Boddie, 105 F.3d at 862 (isolated incidents where female corrections officer

verbally harassed male prisoner, touched his penis, and pressed against him with her breasts found "despicable . . . [b]ut [] do not involve a harm of federal constitutional proportions.").

Mr. Pantusco cites to Lewis v. Fischer, No. 08-3027, 2009 WL 689803 (E.D.N.Y. Mar. 12, 2009) to support his contention that Sco. Sorrell's conduct constitutes an Eighth Amendment violation. In that case, several corrections officers conducted an unwarranted pat down of a prisoner during which one officer put his hand down the prisoner's pants, fondled his penis, and squeezed his testicles for a full ten seconds, causing significant physical pain. Lewis, 2009 WL 689803, at *1. The court found the pat down to be an Eighth Amendment violation because it was "neither routine nor based on a search for weapons or contraband but rather was harassment and punishment," resulting in "humiliation, physical pain . . . and subsequent psychological harm." Id. at *5.

In contrast, Mr. Pantusco alleges that Sco. Sorrell briefly groped his penis through his pant leg during a routine pat frisk. In addition, he does not allege any resulting physical or psychological injury. Thus, while Sco. Sorrell's alleged conduct, if true, is appalling, it does not give rise to an Eighth Amendment violation. As a result, Mr. Pantusco's claim of cruel and unusual punishment is dismissed.

  *iii.*  ***Retaliation***

Defendants argue that Mr. Pantusco "provides no facts to suggest he was retaliated against." (Def.'s Br. Summ. J. 16.) Mr. Pantusco counters that his filing a grievance against Sco. Sorrell for sexual assault resulted in retaliation in the form of (1) false reports filed by corrections officers in connection with the investigation of the alleged sexual assault, and (2) a threat of further sexual assault by Sco. Sorrell.

14

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under Section 1983." White v. Napoleon, 897 F.2d 103, 111-12, (3d Cir. 1990). "Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) (quotations and citations omitted).

To state a claim for retaliation, Mr. Pantusco must first show that he was engaged in constitutionally protected activity. Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002). It is well-settled that filing grievances against corrections officers is protected activity under the First Amendment. Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003).

Second, Mr. Pantusco must show that he suffered adverse action at the hands of prison officials "sufficient to deter a person of ordinary firmness from exercising his constitutional rights." Carter, 292 F.3d at 158. For example, filing false disciplinary reports amounts to such adverse action. Smith v. Messinger, 293 F.3d 641, 653 (3d Cir. 2002). However, what ultimately constitutes such adverse action "will depend on the facts of the particular case." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000).

Third, Mr. Pantusco must show a causal link between exercising his constitutional rights and the adverse action. Carter, 292 F.3d at 158. "A suggestive temporal proximity" between the protected conduct and alleged adverse action may provide the basis for such a link. See Rauser v. Horn, 241 F.3d 330, 334 (3d Cir. 2001).

If Mr. Pantusco can make this showing, the burden shifts to the prison officials to show that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Id.

Here, Mr. Pantusco's filing a grievance in connection with the alleged sexual assault constitutes protected activity under the First Amendment. However, the investigation into the sexual assault did not result in any harm to or action against Mr. Pantusco. Thus, while the evidence of false statements filed in connection with that investigation is troubling, those statements do not constitute adverse action.[5] In addition, Sco. Sorrell's threat that he was "really going to frisk" Mr. Pantusco cannot provide the basis for a retaliation claim because "threats alone do not constitute retaliation." Burgos v. Canino, 358 Fed. App'x 302, 306 (3d Cir. 2009). Therefore, Mr. Pantusco's retaliation claim is dismissed.

### III.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED. Mr. Pantusco's Amended Complaint is dismissed in its entirety with prejudice.

The Court will enter an order implementing this opinion.

    __/s/Dickinson R. Debevoise_____
    DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: May 31, 2011

---

[5] Nor can the disciplinary action taken against Mr. Pantusco for refusing to submit to Sco. Sorrell's second pat-frisk provide the basis for a retaliation claim because there is no dispute that Mr. Pantusco refused to do so.